We'll hear the next case, Loeza v. JPMorgan. Good morning. May it please the court, my name is Sam Bonderoff, along with my colleague Jacob Zemanski. We represent plaintiffs' appellants in this matter. This case is about the Supreme Court's holding in the case Fifth Third Bank Corp v. Dudenhofer and its articulation of and how we should apply it in a situation like this one, where you have fiduciaries of the employee stock option plan who are also senior corporate insiders with direct first-hand knowledge that the company has defrauded the market and that therefore the company stock is trading at an artificially inflated price. What Dudenhofer holds is that you want a pleading standard in these cases that serves both as a gatekeeper function to keep a flood of cases from being brought, but you also don't want a pleading standard that is impossible to meet. And that was part of the court's reasoning in rejecting the munch presumption, which it said essentially is impossible to plead unless you have a company that is in dire circumstances. And what's more, having a presumption like that in place for the defense essentially makes the prudent man standard that's supposed to apply obsolete. Justice Kennedy called it, in oral argument, a coach class trustee. Essentially, the only part of the prudent man standard that an ESOP, an employee stock option plan fiduciary, should be exempt from is the requirement to diversify. Aren't you just arguing Dudenhofer was wrong? No, Your Honor. How is it applied then in a situation like this when the stock drops 16% the day it's discovered? I mean, how do you distinguish this circumstance from Dudenhofer and say Dudenhofer's still good luck? Your Honor, we actually would say that this case is very much like Dudenhofer in that you have these insiders who are also the fiduciaries. They have inside information, and they know that there's a fraud. What Dudenhofer talks about is sort of two situations. They call it, the actual languages they use is a rock and a hard place. And they say, in many cases an ESOP fiduciary who fears that continuing to invest in company stock may be imprudent. And so he finds himself between a rock and a hard place. If he keeps investing and the stock goes down, he may be sued for acting imprudently. But if the stock goes up, he may be sued for disobeying the plan documents. And this concern, again, is reflected in Judge Kaczynski's dissent in the Ninth Circuit in the Amgen case, where he talks about you have a situation where a fiduciary might not know whether there's a securities violation. He only has reason to suspect there's one. In conditions of uncertainty, if you have an overbroad understanding of what more harm than good means and how to plead it, you'll have a situation where you have fiduciaries essentially second-guessing the people responsible for making securities law disclosures. And we agree that you don't want that. But that's why we draw a distinction, why this case is distinct from Dudenhofer and from this court's opinion in Lehman Brothers, because here you have a situation where the fiduciary and the corporate insider with knowledge of the fraud, direct knowledge, who's actually participating in the fraud, are the same people. To draw a contrast, the committee that is the ESOP fiduciary in this case had other members besides John Wilmot, and one of them was a woman named Bernadette Ulysses. If they make the disclosure, the stock price drops a lot, how do we figure out this more consistent analysis? How do we do the analysis? Well, Your Honor, we first of all we say, okay, is the fraud known or only suspected? In this case, we... How do we do it in a 12b6 context? Well, in the 12b6 context you have the PSLRA's pleading standard. You have to plead that there is fraud, that there's actually been fraudulent statements, and you have to plead see enter on the part of the people making the statements. In the ERISA context, it's you don't have to plead see enter, but we argue you do have to plead that you have knowledgeable fiduciaries, which is not an easy thing to plead, that the fiduciaries actually know that there's artificial inflation, and you have to, in fact, plead the fraud. You have to make a 9b pleading. Do you have to plead that a prudent fiduciary could not conclude that the alternative actions would do more harm than good? We believe that is the standard as articulated by Dudenhofer. However, I would suggest that that is not a standard that creates a situation where any possible, you know, any fiduciary you can imagine who could somehow come up with a circumstance where it might not do more harm than, it might do more harm than good, therefore allows the defendants to escape liability. It's a reasonable, it's a fiduciary who could reasonably believe... How could, in this context, a prudent fiduciary conclude that disclosure, corrective disclosure, would not do more harm than good? Very simply, you have three things going on. You have people buying, planned participants who are buying company stock, people holding it, and people selling it. The people buying it are buying it at an inflated price. You know this. And no matter what happens to the stock down the road, those people are being injured. In the words of this court, they are paying too dearly for the company stock. The people holding it... Disclosing does some good as to that group. Absolutely. The people who are holding it, and the correction that will occur when the truth is disclosed will be no greater than the amount by which it's artificially inflated. That's the efficient markets hypothesis. It's the basis for securities law. It's quoted in the Dudenhofer opinion. They're not harmed because the inflation is artificially inflated. So they're just getting back to where they would be without the fraud. Exactly, Your Honor. And the fear that there will be some kind of over-correction is without any basis. And there's no reason for a plaintiff to have to plead around the possibility of a fraud. I'm going to finish my answer. Sellers are arguably benefiting from selling at an artificially inflated price. But consider what sort of a rule we're laying down if we say it's okay for a fiduciary to allow a fraud to continue so that certain plan participants can benefit. That's not fulfilling his fiduciary duty to be truthful, and it's getting dangerously close to insider trading. So for those reasons, we would suggest that this case would be decided under Dudenhofer, we've suggested. Thank you. May it please the Court, Richard Pepperman on behalf of the defendants' appellees. Your Honor, I have four brief points that I would like to cover this morning in response to the plaintiff's arguments. The first is, since the parties began briefing defendants post-Dudenhofer motion to dismiss in March of last year, the legal authority on which the plaintiffs attempt to base their argument has disappeared. In opposing our motion to dismiss, plaintiffs relied primarily on the Ninth Circuit's 2014 Amgen decision, which they described as being directly on point and the first major post-Dudenhofer decision. As this Court knows, earlier this year, the Supreme Court summarily reversed the Ninth Circuit's Amgen decision. In their briefs in this Court, plaintiffs still essentially rely on the same arguments based on the Ninth Circuit's Amgen decision that the Supreme Court has now rejected. They simply no longer cite the Ninth Circuit's opinion as authority for those arguments, but they cannot escape the Supreme Court's summary reversal in that manner. The other case on which plaintiffs primarily relied below was the District Court's decision denying defendants motion to dismiss in the BP case, and the plaintiffs continue to rely on that decision in their briefs in this Court. As we explained in our briefs... It seems to me that the more harm than good analysis, which I think is the focus here, is, is it a factual question? How does one decide it on a 12B6 motion? Your Honor, the Supreme Court articulated the Dudenhofer more harm than good test as a pleading test. That was the express purpose of articulating that. I understand that, but in thinking back to how one would try to apply that in a 12B6 context, I mean, is it, is it plausible that a prudent fiduciary could not conclude that the alternative actions would do more harm? It's just so, with the double negatives and it's convoluted, how does the Court engage in that analysis? A couple points, Your Honor. First, the Supreme Court said that what is required is a careful, context-sensitive scrutiny of the complaint's allegations. Can I do that then to follow up on Judge Chin's questions, which are paragraphs 18 and 19 They do allege in paragraph 18, the longer a fraud goes on, the more painful the correction would be, as experienced finance executives like these two defendants would know. In paragraph 19, if defendants had engineered disclosure of the truth prior to that date, which is the public disclosure date, planned participants would be less. In a 12B6 situation, isn't this enough to say, well, it's not so simple to say whenever it's a big problem, you can't disclose it. Let's look at the circumstances here to see if it could have been engineered by these fiduciaries better to have less of a loss than just public disclosure. Your Honor, as I read it, there are only two paragraphs in the plaintiff's 243-paragraph complaint that go directly to the more harm than good standard. I believe they are paragraphs 18 and 212. I think paragraph 19 doesn't go directly to it. But I think the answer to your point, Your Honor, is I think the district court got it right here that the allegations in paragraphs 18 and 19 and in paragraphs 212 are allegations that could be made in essentially any ERISA stock drop action. These actions are typically filed after there has been a large stock drop that has led to a securities fraud class action. And corporate insiders are typically ERISA fiduciaries. And these very general conclusory allegations in paragraphs 18 and paragraphs 212 that sort of state as a bright line per se rule manner that the disclosure of a fraud is always painful and the stock price will always drop, that kind of per se rule is not what the Supreme Court had in mind in Dudenhofer when it spoke about a careful context-sensitive analysis of the complaint's allegations. I would say that an ERISA fiduciary needs to consider… If there is fraud, assume that there was fraud, the fiduciary knows of it, can the fiduciary refrain from disclosing just because it's going to cause a drop in the price? Your Honor… Then we get into the conflict between securities law and ERISA. Well, Your Honor, two points on that if I may. If the law were such, if the law were as the plaintiffs describe it, then the result in the Supreme Court in both Amgen and Dudenhofer would have been different. For example, in Amgen, there was securities fraud class action that had survived a motion to dismiss. That in and of itself was not enough. I would submit that an ERISA fiduciary needs to consider at least three considerations in deciding whether either freezing the plan in its entirety or making some corrective disclosure might do more harm than good. And I submit these are the three considerations. First, the total amount of company stock already held by the plan. Based on the allegations of the complaint here, we know that as of the end of 2011, the J.P. Morgan Company Stock Plan held $2.3 billion in J.P. Morgan stock. Second would be the extent of the potential losses. Here, you're dealing with an alleged fraud related to a single portfolio in one of J.P. Morgan's six business units. It's not an alleged fraud that goes to the core of the company. It is a limited potential losses, which is why the stock drop over the entire post-disclosure period was only 16%. The third consideration that I submit an ERISA fiduciary needs to take into account is the overall health of the company. If the company is otherwise healthy and expected to do well, then the stock price can be expected to rebound after the temporary decline. But the second point I'd like to make, Your Honor, because— Are you suggesting that in that scenario, the fiduciary engages in that analysis and concludes that corrective disclosure would do more harm than good, then he's not obliged to comply with the securities laws? Your Honor, let me address the securities laws questions. Because as this case has been briefed and actually has been argued this morning, it is in effect morphing into a securities fraud case, in that statements made on April 13, 2012 inflated the stock price. There was a separate securities fraud class action. That case settled for $150 million. The plan here and all of the plan participants are included in that settlement class. So to the extent that the purchasers in the plan acquired J.P. Morgan stock at a price that was inflated by virtue of the statements at issue in the securities fraud action, the April 13, 2012 action, the members of the plan can recover pursuant to that settlement to the exact same extent of every J.P. Morgan shareholder. This court need not bend the ERISA standard in order to provide for a remedy here for securities fraud because, again, the plan has— But you're saying, I think, to the extent there's a securities law violation, they would have a remedy as a member of the class in the securities case. And here we should be focusing on whatever their ERISA injury is. Yes, Your Honor. What I would say is that the two proposed alternative actions here, the first in terms of what the ERISA fiduciaries would disclose, I think if you look at paragraph two of the complaint, the plaintiffs say that what they should have disclosed was J.P. Morgan's, quote, pernicious risk-taking or pernicious speculation or J.P. Morgan's wholesale abandonment of its risk management policies. If those disclosures had been made at the beginning of the class period here, which is actually December 2011, I mean, an ERISA fiduciary could quite plausibly clothe those kind of disclosures would cause a dramatic decline in the stock price and thereby harm more the $2.3 billion of stock that the plan already owns. I mean, the last thing I'd like to say, Your Honor, because I felt obliged to advise the court of this, I was talking about the BP case. That was argued on August 1st of this year. And I will say that at the beginning of that argument on August 1st of this year, the panel stated, quote, we agree with you, and that's the defendants in that case, that the district court applied the wrong standard in the BP case. And then the remainder of the argument before the Fifth Circuit was devoted to the question of whether the Fifth Circuit should remand for application of the correct standard or whether the Fifth Circuit itself should assess the sufficiency of the complaint's allegations under the correct standard. But I felt obliged to advise the court of the status of that case because that is the other appeal that I'm aware of that's up now in the Court of Appeals applying the Dudenhoffer standard. Thank you. We'll hear the rebuttal. Quickly, just to address a few points made by counsel for the appellees. First of all, the three factors set forth by counsel that he says an ERISA fiduciary should consider in evaluating the more harm than good test, those three factors appear nowhere in Dudenhoffer or Amgen or any other case before any other court. They appear to have just been manufactured. Well, in fact, logic to them in terms of evaluating the impact. There is some, but... Are there other factors that a fiduciary should look at instead of these three? It would depend on the case, but we think in this case it's very simple. And if you strip away everything, you have a stock price that is known to be artificially inflated, so you know that purchasers are buying it at an inflated price and you know that the longer that goes on, the more of them will buy it and the more will be injured. You know that the longer the fraud goes on, you will have a harsher correction. And which would you rather as a fiduciary have, a sooner and softer correction or a longer, a later and harsher correction? And you know that you can prevent further damage to those planned purchasers by making a disclosure now. Or at least in your case of Wilmot, going to his boss, the other fiduciary, Mr. Brownstein, who does have reporting responsibility, and saying to him, you should make this disclosure because not only is it fraudulent on the market generally, but it is also hurting planned participants and we owe them the highest duty known to the law. Second... How is that situation different than the typical case under Doudna for that? Well... Do those factors apply to all these cases? They will apply to most of them, certainly. However, there will be many cases, this is not going to, the standard we're articulating is not going to open the floodgates because there will be situations, much like the one pleaded in the Lehman case, where you have a fiduciary who thinks there might be artificial inflation but doesn't know for sure. If you think it, if you can't as a plaintiff plead knowledge, certainty on the part of the fiduciary, then you haven't succeeded under more harm than good. Because in that case, a fiduciary really could look at the situation and say, well, if I do nothing, maybe it will turn out there isn't fraud and I'll do an investigation and find out there's no fraud and I don't want to spook the market unnecessarily. So it's okay that I did nothing. That's not the situation here. And that, we believe, is what Doudna is trying to distinguish between. Situations where you think there might be fraud versus situations where you know there's fraud. And when you know there's fraud, the idea that there's going to be an overcorrection has no basis in fact. If it does, then the efficient markets hypothesis should be thrown out the window because under the efficient markets hypothesis, it's only going to decline by the value it's artificially inflated to begin with. For these reasons, Your Honor, I respectfully request release. Thank you. Rule of reserve decision.